QUENTIN C. WARD,

        Plaintiff,

v.                                                 Case No. 21-C-1155

NATE TAPIO,
GINA BUONO, and
LAURA SUKOWATY,

        Defendants.

## DECISION AND ORDER

Plaintiff Quentin Ward, a prisoner at Racine Correctional Institution who is representing himself, is proceeding on Eighth Amendment deliberate indifference claims against Defendants Nate Tapio, Gina Buono, and Laura Sukowaty based on allegations that they were deliberately indifferent to his chronic pain. On August 3, 2022, Ward filed a motion for summary judgment. Defendants filed their own motion for summary judgment on October 26, 2022. For the reasons explained in this decision, the Court will deny Ward's motion, grant Defendants' motion, and dismiss this case.

### BACKGROUND

During the time relevant to this action, Ward was an inmate at the Milwaukee Secure Detention Facility (MSDF), where Tapio worked as an Advanced Practice Nurse Prescriber (APNP) and Dr. Buono worked as an Associate Medical Director; Dr. Sukowaty worked as an Associate Medical Director at Dodge Correctional Institution. Ward has chronic pain throughout his body because of several conditions associated with general wear and tear changes to the spinal bones in his neck. On March 19, 2019, he was released from prison to supervision. A little more

than a year later, he was admitted back into custody on a Division of Community Corrections hold. He was housed at MSDF, where APNP Tapio provided him care from June 3, 2020, to November 23, 2021. Dkt. No. 41 at ¶¶1-4; 22-26.

APNP Tapio first examined Ward during his intake physical, during which Ward reported neck pain that radiated to his right leg and arm. Because of the pandemic, Ward had been unable to secure medical care during the fourteen months he was on supervised release. Ward reported to APNP Tapio that over the years he had been prescribed many medications, including duloxetine, amitriptyline, Vicodin, morphine, pregabalin, and gabapentin, but all of them were generally ineffective. Ward also informed APNP Tapio that he had been prescribed a low dose of methadone after a 2007 surgery, which had been effective in reducing his pain. Tapio explains that Ward had been admitted to MSDF on a probation hold without a clear disposition, which meant Ward could be released at any time. Given that Ward had not received any medical intervention for more than a year, that his release could be imminent, and that chronic opiates are not the first line of care, APNP Tapio decided to reinstate the medications that Ward had been taking when he was released from prison a year earlier—acetaminophen, ibuprofen, and topical menthol-methyl salicylate—and refer him to physical therapy. *Id.* at ¶¶28-32.

About a week later, on June 9, 2020, APNP Tapio saw Ward again about his chronic pain. He offered Ward a two-week trial of a muscle relaxer used to treat muscle spasms and pain to help break the pain cycle. APNP Tapio also added extra Tylenol twice daily as needed and offered Ward a trial of amitriptyline, nortriptyline, or duloxetine, which are antidepressants that are used to treat nerve pain, or a different NSAID. Ward declined these medications because he had tried them in the past and they had been ineffective. *Id.* at ¶¶34-35.

A few weeks later, on July 2, 2020, APNP Tapio again saw Ward, and following Ward's assertion that he was still in pain, APNP Tapio prescribed a different muscle relaxer. APNP Tapio

also discussed Ward's case with the physical therapist, who gave Ward a TENS unit. A week later, in response to Ward's complaints that the new muscle relaxer made him sleepy, APNP Tapio prescribed lidocaine cream and a different NSAID to replace the ibuprofen. In early August, APNP Tapio again met with Ward. Ward complained he was still in pain and explained that, in the past, methadone had helped with the pain. APNP Tapio observed in Ward's medical records that in 2017, after Ward had been caught with methadone on his person, the treating physician had recommended that opioids not be used to treat Ward's chronic pain. *See* Dkt. No. 32-1 at 11. Given this history and APNP Tapio's belief that there were other, less risky medications that could provide Ward with relief, APNP Tapio concluded that a narcotic (specifically, methadone) was not the appropriate medication for Ward. However, APNP Tapio decided to prescribe another short burst of the muscle relaxer because it had allowed Ward to rest, and he agreed to place a gabapentinoid request for pregabalin. Dkt. No. 41 at ¶¶38-44.

That same day, APNP Tapio placed the gabapentinoid request and explained Ward's condition and noted the medications he had tried without success. A few days later, the request was denied by Associate Medical Director Dave Burnett, who is not a defendant. He noted that there is no cure for chronic pain and the goal of managing chronic pain is to use a multi-modal approach with evidence-based interventions to assist in day-to-day function. Dr. Burnett recommended that APNP Tapio try duloxetine again. Although Ward had previously tried duloxetine without success, APNP Tapio explains that it had been several years since Ward had used it and he had previously used it at a low dose. APNP Tapio believed it was worthwhile to try again at a higher dose with a longer duration. *Id.* at ¶¶44-47.

APNP Tapio next saw Ward on October 27, 2020. He informed Ward that the gabapentinoid request had been denied. He also reminded Ward that the 2017 opioid request had been denied. Ward informed APNP Tapio that he did not refill one of his prescriptions because it

3

was not helping. He also told APNP Tapio that he did not like taking antidepressants to treat his pain because they made him very sleepy and lethargic, making it hard for him to function. APNP Tapio had previously referred Ward to a pain management clinic and a rheumatologist, so he decided to wait for their input before prescribing anything else. He also ordered a neurosurgery consult for further guidance. APNP Tapio recommended that Ward continue to wear his night splints for carpal tunnel relief and continue with his TENS unit as needed. *Id.* at ¶¶49-51.

Ward was taken to the pain clinic on November 2, 2020. The doctor recommended Ward get a CT scan and suggested that he might benefit from a cervical epidural steroid injection. The doctor also suggested, if allowed by the prison, that Ward be prescribed methadone with frequent monitoring. A few days later, APNP Tapio submitted an authorization request for chronic opioid use consistent with the doctor's recommendation. APNP Tapio noted that Ward had a history of chronic pain, and that he had quit his institution job because of the pain although he seemed functional. APNP Tapio also explained Ward had a history of smoking, a remote history of PCP use, and that a 2017 request for opioids had referenced methadone misuse. APNP Tapio listed the medications Ward had tried with limited benefit. He also noted that Ward had a pending pain management referral for a possible steroid injection and a pending neurosurgery consult. APNP Tapio then presented his request to the relevant committee, which was chaired by Dr. Sukowaty. In addition to Tapio's request and presentation, the committee had access to Ward's medical records. *Id.* at ¶¶52-56.

Less than a week later, on November 10, 2022, the committee denied APNP Tapio's request. The committee noted that the pain management clinic had recommended several therapies, not just methadone. Dr. Sukowaty also noted Ward's unwillingness to try amitriptyline or venlafaxine and observed that methadone was not a good choice for the correctional environment because of the risk of diversion. Dr. Sukowaty recommended an epidural steroid

4

injection and a return to pain management if that was not effective to find an alternate treatment not involving opiates long term. *Id.* at ¶¶57-62.

Over the course of the next several months, Ward was seen by a rheumatologist twice and a neurologist, was provided with additional medications including anti-inflammatory steroids, a different NSAID, and muscle relaxers, underwent a CT and MRI, went back to the pain clinic, and was offered surgical intervention (which he later received). APNP Tapio also submitted a second request for gabapentin, but Dr. Buono denied the request, noting that APNP Tapio had not documented an adequate trial of other pain medications including antidepressants such as duloxetine at an adequate dose for three months. *Id.* at ¶¶64-72, 74-75.

Ward expressed frustration that the "same regimens were being used over and over," but APNP Tapio explains that he believed it important to offer all possible options to Ward because it was not always clear to him what dosage or for how long Ward had tried a particular medication. APNP Tapio explains that medications that had been ineffective in the past might have required a higher dose or longer trial to reach full effectiveness. APNP Tapio also emphasizes that he was not merely relying on medication to address Ward's chronic pain. He highlights that he had recommended multiple subspecialty consults, imaging studies, physical therapy, injections and TENS therapy, positioning aids, and assistive devices. *Id.* at ¶73.

By the end of March 2021, APNP Tapio did not know how to proceed with Ward's care, so he decided to seek guidance from the relevant committee. He submitted another authorization for chronic opioid use on April 2, 2021, but he continued to believe methadone was not an appropriate option. Tapio explains that he left the section regarding the proposed regimen blank because he did not have anything specific in mind; he simply wanted guidance. In addressing the request, Dr. Buono noted that Tapio needed to decide what medication he wanted to request and

5

describe the medical condition he was trying to treat and what he believed was causing Ward's pain. *Id.* at ¶¶78, 80.

On April 9, 2021, APNP Tapio offered Ward a trial of gabapentin or tramadol. Ward opted for tramadol, a narcotic/opioid. APNP Tapio explains that as an advanced care provider, he is allowed to prescribe short-term, seven-day prescriptions for narcotic-type pain medication such as tramadol. He notes, however, that after seven days, Ward would have to be reevaluated and the prescription could be renewed only up to three times for a total of twenty-eight days. If APNP Tapio wanted to request tramadol for longer than twenty-eight days, he would have to obtain the relevant committee's approval. During the follow-up exams, Ward indicated he was getting some relief from the tramadol and explained he was sleeping most of the day. A functional observation by a correctional officer revealed that Ward was able to move moderately well. *Id.* at ¶¶83-87.

In late April, Ward had surgery, which went well, and he was released from the hospital on May 4, 2021, back to MSDF. APNP Tapio obtained permission to continue Ward on tramadol for ninety days following his surgery, but Dr. Buono instructed him to taper Ward during that time and then transition him to more chronic pain options. In late May, Dr. Buono approved Tapio's request to place Ward on pregabalin for fourteen days to address new complaints of tingling and numbness in his hand. *Id.* at ¶¶89-100.

On June 15, 2021, Ward refused to meet with APNP Tapio. Nonetheless, APNP Tapio alerted Ward that he would start to wean him off the tramadol as planned, and he increased Ward's pregabalin to twice a day for another thirty days. Less than a week later, Ward complained that the pregabalin was not working. APNP Tapio told him he needed to give it more time to be effective. Ward again refused to see APNP Tapio on July 10, 2021. In late July, APNP Tapio informed Ward that opioids for chronic use would not be considered, and he ordered another

referral to neurosurgery and told him he could go back to the pain management clinic for other options, if he wanted. *Id.* at ¶¶101-05.

On August 23, 2021, Ward returned to the pain management clinic with a note asking the doctor to make only non-opioid recommendations. The doctor recommended that Ward continue using pregabalin, ibuprofen, and Tylenol. He also recommended a low dose of Tylenol with codeine or tramadol (narcotics/opioids), but noted that because Ward was incarcerated, this would need to be managed by his prison doctors. On September 30, 2021, Tapio submitted an authorization for chronic opioid use to request the use of acetaminophen with codeine. A few weeks later, the committee granted the request for a trial of ninety days, noting that if Ward had no relief, the prescription should be canceled. On October 26, 2021, Ward signed the chronic pain management agreement, in which he agreed to cooperate with his treatment plan and guidelines regarding medication management while he was taking acetaminophen with codeine. *Id.* at ¶¶106, 111-13.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary

7

judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Ward claims that Defendants' decisions regarding how to treat his chronic pain violated his right to be free from cruel and unusual punishment. "The Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (cleaned up). Courts use a two-part test when determining if medical care amounted to cruel and unusual punishment. They ask "whether a plaintiff suffered from an objectively serious medical condition" and whether the individual defendant was deliberately indifferent to that condition." *Id.* (quoting *Petties v. Carter*, 836 F.3d 734, 739 (7th Cir. 2016)).

There is no dispute that Ward's chronic, severe pain qualifies as an objectively serious medical condition. Nor is there any dispute that Ward received extensive care in an effort to lessen the severity of his pain. While Ward was at MSDF, APNP Tapio examined Ward more than twenty times, prescribed at least eleven different medications, offered other medications that Ward refused, referred Ward to multiple specialists (a pain clinic, rheumatology, and neurology), referred Ward to physical therapy, and ordered a CT scan and MRI. Ward received a TENS unit, underwent surgery to decompress his spinal cord and nerves, and enjoyed the use of multiple assistive devices such as wrist splints. Despite near constant care for his pain, Ward asserts that Defendants were deliberately indifferent to his condition because APNP Tapio prescribed

medications that Ward informed him had been ineffective in the past and because Defendants exhausted all other options before pursuing narcotics/opioids (tramadol and codeine).

As to Ward's first argument, no jury could reasonably conclude that APNP Tapio persisted in a course of treatment he knew to be ineffective. APNP Tapio concedes that he prescribed medications that Ward had told him were ineffective in the past, but he explains that it had been years since Ward had tried those medications and it was not always clear what dosage Ward had tried or how long Ward had tried them. APNP Tapio notes that it was possible that medications that had been ineffective at a lower dose could be effective at a higher dose or if taken for a longer period of time. Dkt. No. 32 at ¶78. Ward presents no evidence supporting a conclusion that APNP Tapio's decision to try the same medications at higher doses and for longer durations was "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). The mere fact that none of the medications ultimately proved to be effective at higher doses or for longer durations does not support a conclusion that APNP Tapio was deliberately indifferent for trying them. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."); *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663-64 (7th Cir. 2016) (explaining no deliberate indifference because no evidence exists that the defendant "knew better" than to pursue the course of treatment he did). Accordingly, APNP Tapio is entitled to summary judgment on this aspect of Ward's claim.

As to Ward's second argument, no jury could reasonably conclude that Defendants were deliberately indifferent because they chose to pursue other options before authorizing an opioid/narcotic to address Ward's chronic pain. Ward explains that he had received a low dose of a narcotic in the past, which had been effective in treating his pain. He also highlights that

9

specialists recommended that he be prescribed a narcotic. But Ward was not entitled to demand specific care, and, regardless of other medical professionals' recommendations, Defendants were entitled to exercise their own medical judgment when deciding whether an opioid/narcotic should be prescribed. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

APNP Tapio explains that there "is conflicting and controversial evidence regarding the long-term benefit of opioid therapy for chronic pain." Dkt. No. 32 at ¶91. Defendants state that "[n]ot only are narcotics highly addictive, but they are also poor drugs for chronic use" because chronic use "can also increase pain, thus perpetuating a cycle of increasing need with decreasing effect." Dkt. No. 30 at ¶16. For this reason, Defendants note that "narcotics should only be prescribed as a last resort when conservative drugs and treatments have failed, and they are recommended for short-term use only." *Id*.

Further, prescribing narcotics in the prison setting, where there is a higher percentage of patients with substance use disorders than in the community, introduces additional risks and challenges. APNP Tapio had noted in Ward's medical records that in 2017, a request for narcotics had been denied because Ward had been found with the narcotic on his person. Ward asserts that he never received a conduct report for medication misuse, but he does not provide any details regarding the incident noted in his medical records. Given the danger of misuse and diversion in the prison setting, it was not inappropriate for Defendants to take this incident into account when deciding whether narcotics were a good option for Ward.

In short, given Defendants' concerns about the long-term use of narcotics to treat chronic pain and their concerns about prescribing narcotics in the prison setting (concerns that were

10

heightened by a past record of misuse), no jury could reasonably conclude that Ward received constitutionally deficient care simply because Defendants exhausted all other options before prescribing a narcotic to address Ward's chronic pain. Defendants are entitled to summary judgment.

## CONCLUSION

For these reasons, Ward's motion for summary judgment (Dkt. No. 22) is **DENIED**, Defendants' motion for summary judgment (Dkt. No. 29) is **GRANTED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of January, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.